Good morning, may it please the Court. This morning, I would like to talk to you about intended loss. The district court mistakenly found that intended loss was straightforward, it was nothing more than a math problem of adding the two construction loan draws that were diverted to find intended loss. That finding is based on two major errors dealing with the meaning of intended loss under the commentary. The first error is that the Court failed to consider the value of the collateral in July 2008 before arriving at intended loss. And the second reason is that the Court erroneously interpreted the higher standard for intended loss under the definition of intended loss in the commentary. The Court found that Roger Pollock purposefully stole the money from the bank by diverting the two construction loan proceeds. And that as a result of that purposeful conduct, knowing that he would default on the construction loan, that that equated to the purpose to intend a loss to the bank. The district court saw no room, no gap between the purpose to take the money and the purpose to cause a loss. And that's not permitted under the guidelines. The colloquy between Court and counsel is instructive. The Court failed to recognize any difference at all. She found the distinction between the intent to commit the crime, to purposely divert the proceeds, and the intent to cause a loss to the bank as a fantasy. Even though sitting out here we had this valuable three-story office building that was available to the victim as collateral. She went on to say during the colloquy Were you saying that the bank should really gamble on the value of the collateral in 2008? Well, I'm not saying that the bank should gamble, Your Honor. But the point is that McCormick teaches us that in a fraud case where collateral is available to the victim, that the district court must consider the collateral in determining intended loss. It's not discretionary when the collateral is available to the victim. The court must consider the value of the collateral in July 2008. She did consider it. She just said it's too difficult to figure out what the value of the collateral was at the time of the foreclosure sale. Two different concepts, Your Honor. There are two different dates that we're talking about. In determining actual loss, the date that the parties agreed to was in April of 2009. And there was a huge battle between the defense and the government as to the value of the collateral for purposes of calculating actual loss in April of 2009. Now, we're talking about an earlier period. We're talking about the commission of the offense in July of 2008. What was the defendant's intent when he diverted those two loan proceeds, and did he intend to inflict pecuniary harm on the bank? There was no battle over that. The government presented no evidence as to the value of the collateral in July of 2008, no evidence as to the defendant's belief as to the subjective belief as to the value of the collateral in July of 2008. Apart from the defendant's testimony, there was substantial evidence in the record that in July of 2008, there was reason that Pollack had a reason to believe that the collateral would cover the loss. He had $2.8 million of his own money in this building. The building was listed at $9.8 million by Colliers, which was far and above what was needed to satisfy the bank for its loss. In addition, at that time, he had negotiated a valuable lease with Legacy Healthcare for the victim. Now, the reason that the court did not credit Mr. Pollack's testimony when he said he did not intend to cause harm to the bank circles back to her misinterpretation of what it means to intend a loss to the bank and the higher intent that is required. It's clear from the colloquy between court and counsel that when she used the word willfully, if he willfully took those construction loan draws, then it's implausible. It's a fantasy to suggest that he didn't also intend to cause harm to the bank, even though we have this valuable piece of collateral that the court has not even considered. And the court is required to consider that collateral, McCormick, in helping to determine it informs the court, it illuminates the issue of intending to cause harm to the bank. And the court ignored it completely. So your point is that he didn't intend to cause any harm to the bank. That's right. And therefore, there was no loss, because they had the, when they foreclosed, they had this collateral in it. Well, I mean. They recouped all their money. Well, there's, you know, I think you're mixing actual and intended loss at the time. Well, I mean, it's hard here not to. Yeah, but sure. And that's what happened. I mean, you know, the third opinion that the court issued was that there, on restitution, is that the bank had suffered no loss. Right. And that she did not order any restitution, because there was no actual loss. But yeah, but. She's just trying to figure out, she was trying to comply with the guidelines. She had, you know, the way the guidelines are set up, she had to figure out whether or not there was an actual loss or whether there was an intended loss. Of course. And she determined that, well, she determined that there was, in my view, that there was no actual loss, because the government failed to prove by clear and convincing evidence, which was their burden, that there was any loss. So then she moved to intended loss. But the mistake on intended loss, it's not enough to prove that he intended the crime, that he purposefully sought to divert these loan proceeds. They have to find more than that. That's the whole idea of the Manitow case, in which the judge in this colloquy said that it was splitting hairs and that it was not credible, that it didn't assist her in drawing the distinction between the intent to commit the crime, he took the money on purpose, and the intent to cause a loss to the bank. Look, he had every reason to believe, based on this record, and as he said, that the building was worth far more than what the bank would be owed as a result of the fraud that he had committed. The Court's got to deal with that issue. The Court can't simply stop its analysis by saying, well, I find that he willfully took the money, end of story. I find it implausible and incredible to believe that when he did that, he didn't intend to cause economic harm to the bank. That's why we have this amendment. What evidence was there as to the actual value of the collateral as of July 2008? The evidence as of July 2008, the only evidence is the evidence that I recited. Which was? Which was that he had $2.8 million of his own money in the bank, that Colliers had listed the building for sale originally for $10 million and then reduced it to $9.8 million, that he was negotiating a valuable lease with the health care company. But the burden was on the government, and the government offered no evidence as to the value of the building in July 2008, no evidence as to the defendant's subjective belief as to the value of the building. You know, the Court, when it came time to Are you saying that in order to value the collateral, the government had the burden of getting an expert witness to come in and say the collateral as of July 2008 was $10 million or whatever? Or $4 million? I'm saying the government had the burden to prove that the defendant intended the bank to suffer a loss. And how are they going to prove that? They're going to prove it by showing that the collateral isn't worth as much as the defendant thinks it's worth? Can't they prove it by saying that there's no basis to put any value on the collateral in the record? Well, they could if there's any evidence in the record for that, but there isn't any evidence What you've recited, the fact that he had an investment in it, the fact that a real estate agent had listed it at a high valuation, but it hadn't sold, the fact that he was negotiating but hadn't made a valuable lease, those are all speculative matters. You can't rely on any of those things for the valuation of the collateral. For intended losses, it's the subjective belief of the defendant. Those facts go to his subjective belief that the collateral is cheap. If he were very optimistic about the project, which he obviously was because he put $2.8 million in it, right, he could say, oh, I really thought at the time that I swung with the money for Mexico, they wouldn't lose any money, and that would be enough. His subjective belief has to be credible. The judge has to make a finding as to whether his subjective belief, but in this case, the court refused to even consider the evidence in the record. Because it was so thin. But the burdens on the government, there's no evidence to suggest that he did not have a subjective belief as to the value of that collateral that it exceeded the money he owed in July of 2008. There isn't any evidence in the record that rebuts the evidence that was presented by the defendant and his testimony that he believed that the bank would not suffer a loss because of the collateral that was available to the bank. The fact of the business is the collateral far exceeded any loss that the bank would suffer, and in the end, they suffered no actual loss. So the problem in this case is the court never even got to that kind of an analysis. Because the court decided if he willfully took the two construction loan draws, that was the end of the story. I don't have to think any more about it. Intended loss now is straightforward. All I have to do is add those two because it is a fantasy. It is implausible. It is impossible to suggest, as we did, that just because he intended to take the money and that he did it on purpose, that he didn't have the purpose to cause the bank a loss. Without ignoring completely, this piece of collateral was out there. She has to deal with it. It wouldn't be sufficient for the judge to say when he took the money by fraud, he didn't care one way or the other whether the bank had a loss. Well, there isn't any evidence to support that assumption. Well, he didn't come forward to give any. Well, he did. He gave some subjective consideration of the value of the property. Well, not only that, he continued. The record shows that he continued to negotiate the lease on behalf of the bank even after he defaulted on the loan, and the evidence shows that the bank then adopted that lease and leased the second floor of the building to Legacy. So there's just really no inference that can be drawn from the evidence that he didn't care. He did care. He had had a long relationship with Banner Bank and its subsidiary. He had borrowed $40 million or more over the years. This was not a con man. This was a businessman who found himself in trouble, and they're simply, that's an inference that the Court could not draw, that he didn't care. You're over your time. Oh, I'm sorry. Thanks. It's all right. Good morning. May it please the Court, Mr. Hovet, Scott Bradford on behalf of the United States. The real issue or the heart of the issue before this Court is whether it is left with a definite and firm conviction that Judge Brown, the District Court judge in this case, made a mistake when it came to her findings on intended loss. I think it's first and foremost important to point out for the record that the parties stipulated that the value of the collateral should be determined in April of 2009, not July 2008, as Mr. Hovet just mentioned, for sentencing purposes. And when the District Court judge did that, there was a round of an evidentiary hearing and a couple of opinions that she issued. She found that she could not, in following the guidelines, sufficiently determine the value of the collateral in order to make a finding on actual loss. The government, in its sentencing position at that time, put forward three alternative calculations, actual loss, intended loss, and gain. Was it the government's position that the bank suffered an actual loss? In its sentencing submissions, the government did put forward that the bank suffered an actual loss of $1.1 million or something like that, yes. And she rejected that? She rejected that finding. It was too speculative. Or establishing the value of the collateral at that time in 2009 was too speculative. And what is a District Court judge to do when you are determining a sentence in 2016, the court in 2008, and you had a lot of dynamic factors back then going on? You had the default on the loan, you had the real estate market crashing, you had the intervention by the bank itself to save its, at that point in time, $5 million investment in a building that was not fully completed? Mr. Bradford, pardon me, what do you say to your learned friend's suggestion that it was the burden of the government to prove what the value of the collateral was? The burden is on the government to prove the value of the collateral. And the government did put forward some evidence for the value of the collateral in April 2009. We also It would have been the market value, correct? Under the guidelines, it's the fair market value. It's hard to determine, and it's hard to discredit Judge Brown in determining what the fair market value was in 2009 for a partially completed building. And what did she find was the fair market values of 2009? She said she couldn't find it. She could not value, she could not find the value of the collateral in 2009. You know, when the bank conducted the, that was when the bank conducted the foreclosure sale, correct? Yes, sir. So usually when the banks do that, they do a market analysis. We put that forward, and that's in the record. There were two figures put forward. One was an as-is value of around $6 million, and the other value put forward by, and I think with the as-is value, there was also a $8 million value associated with the completion of the building in October. So if it were completed in October, the bank thought it might be worth then $8 million. Let me ask you one further question following up on what you said a moment ago, agreeing that it was the burden of proof of the government to show what the value of the collateral was as of April 2009, Judge Brown says she couldn't, she couldn't come to a conclusion as to the value. Doesn't that mean that you didn't carry your burden of proof? I want to also highlight for the Court that the government put three theories of loss forward to the district court at the time of sentencing, actual loss, intended loss, and gain. While the Court said it couldn't find the value of the collateral and therefore could not find actual loss with sufficiency, she turned to intended loss and gain. How could she find what the intended loss was if she couldn't find what the collateral value was? If the collateral value was over $10 million, there wouldn't be any intended loss. Intended loss under the guidelines and in McCormick, I disagree with Mr. Hobbit's reading of McCormick. Under intended actual loss, I think the court does or the district court does need to find the value of the collateral. But under intended loss, it doesn't necessarily need to do so. And here, the district court took a very discreet view of things. She said, let's look at those two payments that he diverted for his personal resort in Mexico that he still owns and is still benefiting from. And then she went on to make findings of circumstantial evidence. This is a fraud case. In most fraud cases, we're talking about circumstantial evidence as opposed to direct evidence. And she said she found the appropriate intent, subjective intent, for him for those two payments of $674,000 because he had a knowledge of the building and lending and lien process. He knew when he diverted that money, he didn't have the means to repay it. He knew the market was in freefall. And he knew that the bank would be in second position behind the construction liens that would then be placed on that collateral. And he also, she also talked to... Construction loan, not a construction lease.  I'm sorry. Lien. Lien. So the liens by the builder, et cetera. So based on those inferences, that circumstantial evidence, she found that he did have the subjective intent for the intended loss of the discreet $674,000 that he diverted to his property in Mexico. But to do that, she had to calculate the construction lien, did she not? We knew what the construction liens were because the bank had to pay him. As against the collateral value, and it had to be in excess of the collateral value. So she had to arrive at some collateral value to say that he intended to cause the bank a loss. I don't think that's the standard for intended loss. Under McCormick, this Court has said we don't... Defendants should not get a windfall based on market conditions. And the Court may, in the appropriate case for intended loss, consider the collateral but doesn't necessarily need to. Isn't that where the district judge concludes that they just can't figure out what the fair market value was? Again, what's a district court judge to do in 2016 with all those dynamic conditions that occurred in 2008, 2009? And let's not forget, but for the bank's intervention to save its collateral, there would have been, as noted in the victim impact statement, an actual loss between $3 and $5 million. The bank intervened after it had already loaned over $5 million, paid off the construction liens that were the result of the diversion, $1.5 million, and had to invest an additional $1 million to get the project completed. So the fact that it has value now is because the bank intervened. Any value at the time, as the judge found, would have been speculative. You had a crashing market, and you had an uncompleted building. I think you started out emphasizing, as I think you should, and correct that this is a clear error standard, right? And we have a judge who went through I don't know how many hours of evidentiary hearings, how many rounds of briefing, considered all the stuff we're talking about, right? And ultimately determined that she could not determine the then fair market value. And don't the guidelines provide for that? And they say, okay, if you can't determine that, then you go on, or actual loss, then you go on to intended loss, et cetera.  And you're right, Your Honor. That was her progression in this case. She started with first, what's the standard? She elevated it to clear and convincing, and then she went through the guidelines. Actual loss, what's the proper intent? Intended loss, what's the proper intent? And then as an alternative finding, she found gain. His gain was also $674,000 that he diverted to Mexico and is still benefiting from. So I think that was my question. And from your standpoint, she followed the guideline progression exactly as she was supposed to do. I agree with that, Your Honor. Thus, the government, I see that I'm almost out of time, Your Honor. If there are no more questions, the government would submit that Judge Brown, the district court judge in this case, correctly found the intended loss here. It was based on the evidence that was before her. And let's not forget that the guidelines don't require a perfect science here. It's a reasonable estimate, and the district court is in the best position to evaluate that loss, given her unique position in this case to evaluate the evidence after the evidentiary hearings and the briefings. Thank you very much. Thank you. You can have one minute for rebuttal, and that's it. Thank you, Your Honor. The standard isn't clear air. The standard is that this Court must engage in de novo review with respect to the failure of the Court to consider the collateral when determining intended loss. They have to engage in de novo. Well, she made a finding that she couldn't determine what the market value was, the fair market value. That's what he's saying. We would have to say that was clearly erroneous. That's a factual determination. The Court also has to consider, as a de novo review, whether the Court correctly concluded and interpreted the meaning of intended loss and the definition of intended loss, and our to an intent to cause a loss. Thank you, Your Honor. Okay.
judges: Paez, Bea, Anello